IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DARREL RUNDUS | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | NO. 3-06-CV-1823-BD |
| | § | |
| CITY OF DALLAS, ET AL. | § | |
| | § | |
| Defendants. | § | |

## **MEMORANDUM OPINION AND ORDER**

In this section 1983 civil rights action tried to the court on stipulated facts and written briefs, two legal issues are presented for determination: (1) whether the Literature Distribution Restriction promulgated by the State Fair of Texas, Inc. ("SFOT"), which prohibits plaintiff from distributing religious materials on the grounds of the State Fair, violates the First and Fourteenth Amendments to the United States Constitution; and (2) whether SFOT, by virtue of its relationship with the City of Dallas ("the City"), is a "state actor" for purposes of section 1983 liability. Concluding that there is no state action, the court enters judgment for the defendants.

I.

SFOT is a private, non-profit corporation that operates the annual State Fair of Texas. (Am. Stip. Facts at 1-2, ¶¶ 1-3). The State Fair, which runs for a period not to exceed 30 days in September and October, is held on public fairgrounds owned by the City of Dallas. (*Id.* at 2, ¶¶ 3-4). SFOT leases the fairgrounds from the City and regulates all expressive activities on the premises during the State Fair. (*Id.* at 3, ¶ 19 & 12-13, ¶¶ 75-78).

A policy promulgated by SFOT generally prohibits the distribution of advertising, flyers, or other written materials on the fairgrounds. (*Id.* at 13, ¶¶ 77, 81). Instead, individuals and organizations wishing to engage in such activities are required to rent exhibit space from SFOT and confine those activities to their allotted space. (*Id.* at 13, ¶ 82). Prospective exhibitors and sponsors must submit an application to SFOT, which evaluates the application based on various factors, including the uniqueness of the exhibit, the type of product, the type of service, educational value, and appropriateness for a family audience. (*Id.* at 14, ¶¶ 86-87). Once the application is approved by SFOT, the exhibitor must sign a written contract agreeing to comply with certain Exhibitor Rules and Regulations. (*Id.* at 14, ¶ 90). Exhibitor Rule 9 provides that the "[d]istribution, sampling, promoting of products outside of the contracted booth/space (as defined by SFOT) is strictly prohibited." (*Id.* at 14, ¶ 91). SFOT offers several justifications for Rule 9 and its general policy prohibiting the distribution of written materials on the fairgrounds, which the parties collectively refer to as the "Literature Distribution Restriction," including:

- the need to maintain the orderly movement of the crowd given the large number of exhibitors and persons attending the State Fair;

- SFOT's interest in protecting fairgoers from deceptive and misleading speech;

- SFOT's interest in protecting fairgoers from harassment and undue annoyance; and

- protecting SFOT's financial interests and the rights of exhibitors who pay for the ability to distribute written materials.

(*Id.* at 16-17, ¶ 111). Over the years, SFOT has leased exhibit space to many different religious organizations, which are then permitted to distribute literature to fairgoers from their assigned booths. (*Id.* at 15-16, ¶¶ 101-104).

In 2006, more than seven million visitors attended the State Fair of Texas. (*Id.* at 41, ¶ 253). One such visitor was plaintiff, Darrel Rundus, an Evangelical Christian who is committed to spreading the Gospel of Jesus Christ and teaching others to do the same. (*Id.* at 18-19, ¶¶ 121-122). When plaintiff attempted to enter the State Fair with printed religious materials, or Bible tracts, SFOT prohibited him from doing so pursuant to the Literature Distribution Restriction. (*Id.* at 26, ¶ 150). SFOT did not prevent plaintiff from distributing religious literature or engaging willing listeners outside the fairgrounds. (*Id.* at 22, ¶ 138). Nor was plaintiff prohibited from initiating purely verbal conversations with patrons on the grounds of the State Fair. (*Id.* at 13, ¶ 79). Indeed, SFOT informed plaintiff that he may talk about his faith with others on the fairgrounds, so long as he did not distribute literature. (*Id.* at 22, ¶ 134). Plaintiff acknowledges that he could distribute Bible tracts from a booth at the State Fair if he paid a fee and was given an exhibitor contract. (*Id.* at 22, ¶ 138). However, plaintiff believes that using a booth is not a viable or an effective method of reaching his audience. (*Id.* at 22-23, ¶ 139).

On October 5, 2006, plaintiff sued SFOT and the City in federal district court for violating his First Amendment right to practice his religion by distributing Bible tracts at and around the State Fair of Texas. As part of his complaint, plaintiff sought a preliminary injunction, which was denied. *Rundus v. City of Dallas, et al.*, No. 3-06-CV-1823-B (N.D. Tex. Oct. 11, 2006). After conducting discovery, the parties were able to stipulate to the relevant facts, leaving only issues of law for the court to decide. Those issues have been fully briefed and argued by the parties, and this case is ripe for final adjudication.

II.

The gravamen of plaintiff's complaint is that the Literature Distribution Restriction promulgated by SFOT violates his First Amendment right to express his religious beliefs through

evangelical activities. In order to seek redress for this alleged constitutional violation, plaintiff must satisfy the requirements of 42 U.S.C. § 1983, which provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983.[1] An essential element of the section 1983 remedy is state action. Merely private conduct, "no matter how discriminatory or wrongful," is not actionable under the statute. *See American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50, 119 S.Ct. 977, 985, 143 L.Ed.2d 130 (1999), *quoting Blum v. Yaretsky*, 457 U.S. 991, 1002, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534 (1982). Unless defendants acted "under color of state law" to deprive plaintiff of a right secured by the Constitution or laws of the United States, plaintiff cannot maintain a cause of action under section 1983. *See West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988).

A.

There is no question that the City of Dallas is a "state actor" for purposes of section 1983 liability. However, in order to maintain a cause of action against the City, plaintiff must prove that the alleged deprivation of his First Amendment rights was the result of an official policy or custom. *See Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). An "official policy" may be either:

1. a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

---

[1] Section 1983 does not create any substantive rights, but instead provides a remedy for violations of federal constitutional and statutory rights. *See Lafleur v. Texas Dept. of Health*, 126 F.3d 758, 759 (5th Cir. 1997) (citing cases).

>    2.  a persistent, widespread practice of city officials or employees which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy.

*Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984); *see also Campbell v. City of San Antonio,* 43 F.3d 973, 977 (5th Cir. 1995). The official policy or custom also must be a "moving force" behind the alleged constitutional violation. *See Piotrowski v. City of Houston,* 237 F.3d 567, 578 (5th Cir.), *cert. denied*, 122 S.Ct. 53 (2001).

The facts of this case, as stipulated by the parties, do not come close to establishing municipal liability under *Monell*. The parties agree that the City had no involvement in the adoption of the Literature Distribution Restriction, or any other restrictions on expressive activities at the State Fair. (Am. Stip. Facts at 14, ¶ 92 & 16, ¶¶ 109-110). Instead, the policy was enacted by SFOT, which also has the authority to expel persons from the fairgrounds for conduct or speech it deems objectionable, unduly annoying, harassing, false, and deceptive. (*Id.* at 13, ¶¶ 77-78, 82). Without evidence of an official policy or custom that was a moving force behind the alleged violation of his First Amendment rights, plaintiff cannot prevail on his section 1983 claim against the City. *See Reinhart v. City of Brookings,* 84 F.3d 1071, 1073 (8th Cir. 1996) (city not liable for actions of private committee that had sole discretion to establish rules concerning expressive activities during annual arts festival held in public park).

### B.

Recognizing that the City had no direct involvement in promulgating the Literature Distribution Restriction or regulating expressive activities at the State Fair, plaintiff offers an alternative theory for section 1983 liability--that SFOT and the City work "hand-in-glove" to operate the State Fair of Texas as a "joint venture." (*See* Plf. Tr. Br. at 6, 9, 10 & Plf. Resp. Br. at 9).

1.

A private actor, such as SFOT, is subject to constitutional liability only when the challenged conduct is "fairly attributable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982). Such a determination involves a two-part inquiry:

> First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible. . . Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State.

*Id.*, 102 S.Ct. at 2753-43; *see also Bass v. Parkwood Hospital*, 180 F.3d 234, 241 (5th Cir. 1999). The Supreme Court has utilized at least three different tests for deciding whether the conduct of a private actor can be fairly attributable to the State: (1) the public function test; (2) the state compulsion test; (3) and the nexus, or state action, test. *See Richard v. Hoechst Celanese Chemical Group, Inc.*, 355 F.3d 345, 352 (5th Cir. 2003), *cert. denied*, 125 S.Ct. 46 (2004) (summarizing tests). Under the public function test, "a private entity acts under color of state law when the entity performs a function which is 'exclusively reserved to the state.'" *Id., quoting Flagg Bros. v. Brooks*, 436 U.S. 149, 157-58, 98 S.Ct. 1729, 1734, 56 L.Ed.2d 185 (1978). The state compulsion test imposes liability for a private decision "only when [the state] has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Id., quoting Blum*, 102 S.Ct. at 2786. The nexus, or state action, test considers whether the state has "so far insinuated itself into a position of interdependence with the [private actor] that it was a joint participant in the enterprise." *Id., quoting Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 357-58, 95 S.Ct. 449, 457, 42 L.Ed.2d 477 (1974). It is not clear whether

these tests are different in operation or merely different ways of characterizing the fact-bound inquiry of deciding whether private conduct constitutes state action. *See Cornish v. Correctional Services Corp.*, 402 F.3d 545, 550 (5th Cir. 2005), *citing Lugar*, 102 S.Ct. at 2755. "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961).

2.

Plaintiff contends that SFOT and the City have worked together for more than 100 years to "provide for the continued operation and presentation" of the State Fair of Texas, thereby making the State Fair a joint enterprise. (*See* Plf. Tr. Br. at 8, 10 & Plf. Exh. 1 at 5, ¶ 3.01). This argument implicates the nexus, or state action, test. In order to prove state action under this theory, plaintiff must show "such a 'close nexus between the State and the challenged action' that [the] seemingly private behavior 'may be fairly treated as that of the State itself.'" *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 295, 121 S.Ct. 924, 930, 148 L.Ed.2d 807 (2001), *quoting Jackson*, 95 S.Ct. at 453. Deciding whether the deprivation of a protected right is fairly attributable to the State "begins by identifying the specific conduct of which the plaintiff complains." *Cornish*, 402 F.3d at 550, *quoting Sullivan*, 119 S.Ct. at 985. As the First Circuit explained:

> This inquiry is a targeted one, with the challenged conduct at the hub of the analytical wheel. Thus, the focal point is the connection between the State and the challenged conduct, not the broader relationship between the State and the private entity. Extensive regulation, without more, cannot establish the necessary nexus. Indeed, even when the State has conferred monopoly status on a private entity, courts will not find state action on a nexus theory absent a snug relationship between the grant of monopoly power and the challenged conduct itself.

*Perkins v. Londonderry Basketball Club*, 196 F.3d 13, 19 (1st Cir. 1999) (internal citations omitted).

Here, the challenged conduct is the adoption and enforcement of the Literature Distribution Restriction, which bars plaintiff from freely passing out religious materials at the State Fair of Texas. Plaintiff does not challenge the operation of the State Fair or the fairgrounds in general. Therefore, whether SFOT and the City have a long history of working together to conduct the State Fair is irrelevant to determining the threshold issue of state action. The relevant inquiry is whether defendants have sufficient involvement with one other in the adoption and enforcement of the Literature Distribution Restriction.

3.

The parties have stipulated that the City had no involvement in the decision to enact the Literature Distribution Restriction. (*See* Am. Stip. Facts at 14, ¶ 92 & 16, ¶ 109). Rather, the policy challenged by plaintiff in this lawsuit was enacted by SFOT, a private non-profit corporation that regulates all expressive activities on the fairgrounds during the period of the State Fair. (*Id.* at 1, ¶¶ 1-2 & 12-13, ¶¶ 75-78). SFOT is governed by an Executive Committee appointed by the Board of Directors. (*Id.* at 12, ¶ 71). No City employees or officials sit on the Executive Committee or are voting members of the SFOT Board. (*Id.* at 12, ¶¶ 72-73).[2]

The Dallas police department typically assigns more than 150 uniformed officers to patrol the fairgrounds during the State Fair. (*Id.* at 28, ¶ 161). The police officers provide security, maintain the peace, and enforce state criminal laws and municipal ordinances. (*Id.* at 28, ¶¶ 161-162). While policing the fairgrounds, the officers are not controlled by SFOT. (*Id.* at 29, ¶ 171). City police officers do not receive training or other specific information about SFOT rules and regulations. (*See id.* at 29, ¶ 170). If a fairgoer violates the Literature Distribution Restriction,

---

[2] Although the president of the Dallas Parks and Recreation Board is an *ex officio* member of the SFOT Board of Directors, he is not a voting member. (*See* Am. Stip. Facts at 12, ¶ 74).

SFOT asks the person to comply with the restriction. (*Id.* at 18, ¶ 117). If the person refuses, SFOT asks the fairgoer to leave the State Fair. (*Id.*). If the person refuses to leave the fairgrounds as instructed, SFOT notifies a City police officer, who issues a criminal trespass warning and either escorts the person off the premises or effects an arrest for criminal trespass. (*Id.* at 18, ¶¶ 118-119). The police do not enforce any SFOT rules governing the conduct of exhibitors and sponsors. (*Id.* at 18, ¶ 120). In this case, the parties have stipulated that it was SFOT officials, not City police officers, who prevented plaintiff from entering the State Fair with his Bible tracts. (*Id.* at 26-27, ¶ 150).

Notwithstanding these facts, plaintiff contends that the activities of SFOT and the City are so "entwined" as to create state action for purposes of section 1983 liability. (*See* Plf. Tr. Br. at 8-10). In support of this argument, plaintiff relies on *Brentwood*, a case where the Supreme Court applied the state action label to a non-profit association that set and enforced standards for athletic competition among both public and private secondary schools in the State of Tennessee. The plaintiff in *Brentwood* was a private high school charged with violating an Association rule that prohibited "undue influence" in the recruitment of student athletes. *Brentwood*, 121 S.Ct. at 929. The school alleged that enforcement of the rule by the Association was state action and violated the First and Fourteenth Amendments. *Id.* The district court enjoined the Association from enforcing the rule, but the Sixth Circuit reversed, finding no state action. *Id.*, *citing Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 180 F.3d 758 (6th Cir. 1999). On certiorari review, a closely divided Supreme Court found state action based on the "pervasive entwinement" of state school officials in the composition and workings of the nominally private Association. *Brentwood*, 121 S.Ct. at 932. The majority opinion stressed two points--that the Association was comprised overwhelmingly of "public schools represented by their officials acting in their official capacity to

provide an integral element of secondary public schooling, " *see id.* at 932, and that the Association set binding athletic standards for public secondary schools throughout Tennessee, including the recruiting standards challenged by plaintiff. *Id.* at 932-33. Because of the "pervasive entwinement" of public school officials, who were clearly state actors, in the structure of the Association, and the fact that the Association had historically regulated high school athletics in lieu of a state Board of Education, the Court held that the Association's regulatory activities constituted state action. *Id.* at 933.

*Brentwood* does not rewrite the nexus test for determining state action. In fact, the Supreme Court expressly recognized that a nominally private entity may be treated as a state actor only "when it is 'entwined with governmental policies,' or when government is 'entwined in [its] management or control.'" *Id.* at 930, *quoting Evans v. Newton*, 382 U.S. 296, 299, 301, 86 S.Ct. 486, 488, 489, 15 L.Ed.2d 373 (1966). The evidence in this case fails to meet that standard. As previously discussed, there is no evidence that the City was involved, much less "pervasively entwined," with any aspect of the Literature Distribution Restriction. Without such evidence, there is absolutely no reason for attributing the actions of SFOT to the City. *See Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 956 (9th Cir. 2008) (no state action where evidence failed to establish that city played a dominant role in controlling the actions of a private organization or the content of a festival); *Lansing v. City of Memphis*, 202 F.3d 821, 833 (6th Cir. 2000) (mere cooperation between private and public actors, such as using criminal trespass laws to maintain order at festival run by private organizer on city property, does not rise to the level of merger required for finding state action). *Cf. Wickersham v. City of Columbia*, 481 F.3d 591, 597-98 (8th Cir.), *cert. denied sub nom., Memorial Day Weekend Salute to Veterans Corp. v. Wickersham*, 128 S.Ct. 387 (2007) (private corporation held to be a state actor where city, in addition to providing critical assistance to the corporation in

the planning and operation of municipal air show, played an active and direct role in enforcing speech restrictions challenged by plaintiff).

## CONCLUSION

Plaintiff has failed to establish the threshold requirement of state action necessary to maintain a civil rights claim against defendants under 42 U.S.C. § 1983. Accordingly, the court finds in favor of defendants. A final judgment dismissing this case will be filed today.[3]

SO ORDERED.

DATED: September 16, 2009.

JEFF KAPLAN
UNITED STATES MAGISTRATE JUDGE

---

[3] In light of the resolution of the state action issue, the court declines to address the more difficult question of whether SFOT violated plaintiff's constitutional rights by prohibiting him from distributing religious materials on the grounds of the State Fair of Texas. *See United States v. Texas*, 445 F.Supp.2d 711, 720 (E.D. Tex. 2006), *citing Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.").